UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, FLORIDA PUBLIC INTEREST RESEARCH GROUP EDUCATION FUND, and ROCK THE VOTE,<br><br>                Plaintiffs,<br><br>           v.<br><br>KURT S. BROWNING, in his official capacity as Secretary of State for the State of Florida, PAMELA J. BONDI, in her official capacity as Attorney General for the State of Florida, and GISELA SALAS, in her official capacity as Director of the Division of Elections within the Department of State for the State of Florida,<br><br>                Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR<br>DECLARATORY AND<br><u>INJUNCTIVE RELIEF</u>** |

        Plaintiffs, by their attorneys, the Brennan Center for Justice at New York University School of Law, the American Civil Liberties Union Foundation of Florida, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Coffey Burlington, for their complaint against Defendants allege as follows:

<u>**Nature of the Action**</u>

        1.      Plaintiffs bring this action to prevent enforcement of a new Florida law— 2011 Fla. Laws 40 § 4 and its implementing regulations (collectively, the "Law")—that unconstitutionally and unlawfully burdens their efforts, and the efforts of other individuals and community-based groups, to encourage civic engagement and democratic participation by assisting Florida citizens in registering to vote and exercising their fundamental right to vote.

2.      Though it has been effective for only a few months, the onerous burdens of the Law are already clear.  Plaintiffs, whose public service missions revolve around increasing voter participation, have ceased or significantly curtailed their registration activities throughout the State out of fear that they will be unable to comply with the Law's requirements and thus be subject to fines, crippling civil and criminal penalties, and devastating reputational harm.

3.      The legislative record reveals that the Law—which is the third such restrictive legislative measure passed by the State in six years—was enacted with the express purpose of making it difficult for citizens to exercise their right to vote.  Senator Michael Bennett, President Pro Tempore of the Florida Senate and one of the most vocal supporters of the Law, stated:  "I want the people in the State of Florida to want to vote as badly as that person in Africa who is willing to walk 200 miles for that opportunity he's never had before in his life.  This should not be easy."  2011 Fla. Senate Deb., Reg. Sess., at 38:35 (May 5, 2011) (statement of Sen. Bennett).  By severely curtailing the voter registration efforts of Plaintiffs and others, the Law will profoundly depress, and perhaps eliminate, voter registration activity by organizations like Plaintiffs that seek to increase civic participation by all Floridians.

4.      Among other things, the Law improperly requires all "third-party voter registration organizations"—broadly defined as "any person, entity, or organization" that "solict[s] or collect[s] voter registration applications," Fla. Stat. § 97.021(37)—to (i) to pre-register with the State and satisfy cumbersome disclosure requirements "*[b]efore* engaging in any voter registration activities" and to continually submit electronic updates

about their organizational status, including any changes to their volunteer base; (ii) track,

inventory, and report every voter registration form they handle on a monthly basis

regardless of whether that form is distributed or completed; (iii) deliver to State election

officials all completed voter registration forms within an arbitrarily narrow and vague 48-

hour window; (iv) submit all mandated forms electronically, without regard for the

limited resources of many community-based voter registration groups; and (v) incur

potentially strict liability for fines ranging from $50 to $1,000 for the untimely delivery

of any completed voter registration applications, be subject to undefined and potentially

limitless civil penalties for any violations of the Law, and face criminal misdemeanor

liability for any violation of the Law for which a penalty is not otherwise provided.  Fla.

Stat. § 97.0575 (emphasis added); Fla. Admin. Code Ann. R. 1S-2.042; *see* Fla. Stat.

§ 104.41 (criminal penalties).

     5.      Unless the Law is enjoined, Plaintiffs' constitutionally protected political

speech and activity will continue to be chilled.  Plaintiffs, as well as many other

individuals and groups, will be forced to communicate fewer civic and nonpartisan

political messages and to refrain from engaging in associational activity important to

advancing their missions and beliefs.  The public will receive less information about how

to participate in the democratic process and will have fewer opportunities to associate

with Plaintiffs in meaningful civic activities.

     6.      Unless the Law is enjoined, it will also continue to violate the federal

National Voter Registration Act of 1993, 42 U.S.C. § 1973gg *et seq.* (the "NVRA").  The

onerous new requirements that the Law imposes on community-based voter registration

groups are plainly inconsistent with the NVRA's text, its structure, and its overriding

purpose to "increase the number of eligible citizens who register to vote in elections" and

"enhance[] the participation of eligible citizens as voters." *Id.* § 1973gg(b).

7.      Furthermore, absent an injunction, thousands of Florida citizens will not

be registered to vote in the upcoming elections.  In violation of Section 2 of the Voting

Rights Act of 1965 (the "Voting Rights Act"), the Law will particularly and

disproportionately harm members of minority communities, who regularly rely on

Plaintiffs and similar community-based groups to help them overcome barriers to

registering to vote and participating in the democratic process.  The Law will likewise

cause disparate harm to senior citizens, students, people with disabilities, and members of

rural and low-income communities.

8.      In 2004, before Florida began restricting community-based voter

registration drives, Florida ranked 33rd in the nation in voter registration rates, with

71.7% of voting age citizens registered.  In 2010, after the State imposed successive

restrictions on community-based voter registration activity, Florida dropped to 38th in the

nation in voter registration rates, with only 63% of voting age citizens registered.  U.S.

Census Bureau, *Current Population Survey* (2004-2010).  The Law can only exacerbate

this downward trend.

9.      No legitimate state interest justifies the extreme cumulative burdens

imposed by the Law.  The Florida Legislature presented no evidence or other findings

that voter registration fraud occurs in Florida in any meaningful magnitude; that the

preexisting, three-year-old law regulating community-based voter registration activity,

coupled with criminal provisions forbidding registration fraud, has been inadequate; or that community-based voter registration groups have either hoarded voter registration forms or otherwise failed to promptly submit forms to election officials under the prior law.

10.     For these reasons, and those specifically alleged herein, Plaintiffs seek a declaratory judgment, preliminary injunction, and permanent injunction prohibiting Defendants from enforcing the Law, and permitting Plaintiffs' constitutionally protected community-based voter registration activities to continue.

## Jurisdiction and Venue

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 2201, and 2202, as well as 42 U.S.C. § 1983.

12.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), on the grounds that Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this district.

## Parties

### Plaintiffs

13.     Plaintiffs are private, nonpartisan groups who seek to encourage widespread civic participation.  Plaintiffs wish to engage in voter registration activities because registering to vote is a necessary precursor to the most important type of democratic activity—voting.  Plaintiffs see their voter registration efforts as a uniquely effective way to communicate civic messages important to Plaintiffs' organizational

missions and to their individual members, and to associate with fellow citizens to advance shared beliefs.

*League of Women Voters of Florida*

14.    Plaintiff League of Women Voters of Florida ("LWVF" or the "League") is the Florida affiliate of the national League of Women Voters (the "national League"). LWVF is a nonpartisan, not-for-profit corporation organized under the laws of Florida, and a tax-exempt entity pursuant to sections 501(c)(3) and 501(c)(4) of the Internal Revenue Code.  Its mission is to promote civic engagement by encouraging the informed and active participation of citizens in government, including by registering citizens to vote and influencing public policy through education and advocacy.  LWVF has approximately 2,800 current dues-paying members in Florida, and a list of about 9,000 members, supporters, and volunteers, who receive regular communications from the League.

15.    The national League has conducted voter registration nationwide since 1920, and LWVF has conducted voter registration in Florida since before 1939.  LWVF conducts voter registration drives through the auspices of its 29 local Leagues of Women Voters ("local Leagues"), which are located in cities and counties throughout Florida, including Tallahassee.  Local Leagues and individual League members also engage in voter registration activities on their own initiative, without assistance from LWVF, collecting and submitting forms on their own.

16.    LWVF has imposed a moratorium on voter registration activities because the League, its members, and its volunteers fear that they will be unable to fully comply

with the Law's myriad requirements and cannot afford to risk incurring large fines or

enduring the reputational harms that would result from even an innocent violation.

LWVF intends for this moratorium to last until the Law is enjoined or limited in such a

way as to substantially reduce the organizational and financial risk to the League, its

members, and its volunteers.

<u>*Florida Public Interest Research Group Education Fund*</u>

17.    Plaintiff Florida Public Interest Research Group Education Fund ("FL

PIRG") is an affiliate of the national Public Interest Research Group.  FL PIRG is a

nonpartisan, not-for-profit corporation organized under the laws of Florida, and a tax-

exempt charity pursuant to section 501(c)(3) of the Internal Revenue Code.  Its mission is

to represent the public interest in the face of special interests and to ensure equal access

to the political process for all.  Registering voters is a key aspect of that mission.  FL

PIRG's sister organization, the 501(c)(4) Florida Public Interest Research Group Citizen

Lobby, has approximately 6,000 members in Florida, and an e-mail list of 10,455 people

who regularly receive communications about FL PIRG's work, mission, and possible

volunteer opportunities.

18.    FL PIRG has existed in Florida for approximately 25 years, and it has

been registering voters for over 20 years.  Since the 2004 election cycle, FL PIRG has

registered approximately 23,000 Florida citizens to vote.  FL PIRG focuses its voter

registration efforts on student populations within Florida, mostly between the ages of 18

and 22.  Almost one half of the students that FL PIRG registered in 2010 were non-white.

19.     FL PIRG hires campus organizers, who are often recent college graduates, to plan and organize voter registration drives at college campuses around the country. The organization conducts national training sessions for campus organizers, who, in turn, train students and other volunteers.  Often these volunteers are recruited on the day of registration events.  FL PIRG also conducts door-to-door registration activities.

20.     FL PIRG believes that, because the Law increases administrative burdens on registered groups and requires dramatically faster form turnaround, it makes voter registration drives more costly.  FL PIRG will require more funding and more staff to ensure successful voter registration efforts.  The organization will have to spend proportionately less money, time, and resources on voter registration and more on ensuring compliance with the Law's complex and confusing requirements.

<em>Rock the Vote</em>

21.     Plaintiff Rock the Vote ("RTV") is a nonpartisan, not-for-profit national organization, and it is a tax-exempt charity pursuant to section 501(c)(3) of the Internal Revenue Code.  Its fundamental mission is to engage and build political power for young people in our country by increasing voter registration rates and voter turnout among younger voters.  Critical to that mission are the organization's efforts to register young people to vote and to encourage them to vote on election days.  RTV has approximately 1.5 million members in its national database, and approximately 82,000 members in Florida.

22.     RTV began its first field campaign to push young Americans to register to vote in 1992.  Since that time, RTV has registered more young people to vote than any

other organization.  Nationwide, RTV helped approximately 2 million people complete voter registration applications in 2008 and approximately 300,000 in 2010.  In 2008, RTV registered more voters in Florida than the margin of victory for the office of U.S. President.

23.     RTV typically registers citizens who are between the ages of 18 and 29, and it reaches this population through a variety of methods.  RTV makes voter registration forms and instructions available on its website, and it also conducts in-person registration drives staffed by volunteers at college campuses and in other locations.  In addition, it has developed a "Democracy Class" curriculum that local educators use to teach high school students about the importance of civic engagement.  Through this program, RTV partners with high school teachers and instructs them regarding the collection of voter registration applications from their students.

24.     RTV has ceased all of its in-person voter registration activity in Florida, including its Democracy Class program, because it lacks the resources and personnel to comply with the Law's numerous requirements and restrictions.

<u>Defendants</u>

25.     Defendants are authorized and required by Florida law to interpret and enforce the challenged Law.

26.     Defendant Kurt S. Browning is the Secretary of State for the State of Florida.  He is Florida's chief election officer.  Fla. Stat. § 97.012.  His responsibilities include "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws" and "[p]rovid[ing] uniform standards for the proper

and equitable implementation of the registration laws." *Id.* As such, Secretary Browning, among other things, must coordinate the State's responsibilities under the NVRA and ensure that all voter registration applications and forms prescribed or approved by the Florida Division of Elections are in compliance with the NVRA and the Voting Rights Act. *Id.*

27.     Defendant Pamela J. Bondi is the Attorney General for the State of Florida. The Law expressly grants her the power to civilly enforce its provisions upon the recommendation of Secretary Browning. Fla. Stat. § 97.0575(4). She is also required to "appear in and attend to" all criminal prosecutions on behalf of the State, which would necessarily include any criminal prosecutions for a violation of the Law. *See id.* § 16.01(4).

28.     Defendant Gisela Salas is the Director of the Division of Elections of the Florida Department of State. The Law requires the Division of Elections to adopt forms and rules to carry out its requirements, *id.* § 97.0575(5), which the Division has already done, *see* Fla. Admin. Code Ann. R. 1S-2.042.

### **Voter Registration Activities in Florida**

29.     Voter registration in Florida is conducted in a variety of ways, including by government agencies and officials, individual citizens, and community-based groups. Federal and state law require Florida election officials to provide voter registration applications by mail and at the following locations:  Department of Highway Safety and Motor Vehicle offices, armed forces recruitment offices, qualifying educational institutions, public assistance offices, public libraries, agencies that serve persons with

disabilities, centers for independent living, and supervisors of elections' offices.  *See* 42

U.S.C. § 1973gg-5; Fla. Stat. §§ 97.021(41), 97.052(1)(b).

30. According to data provided by the U.S. Census Bureau's *Current*

*Population Survey*, approximately 7,994,000 Florida citizens were registered to vote as of

November 2010, out of a citizen voting age population ("CVAP") of 12,697,000.

Overall, 63% of the CVAP in Florida were registered as of November 2010, down from

70.4% in November 2008.  White citizens are registered at a higher rate than black and

Hispanic citizens:  The rates were 64.7% for whites, 61.4% for blacks, and 59% for

Hispanics.

### Voter Registration Drives and Political Speech and Association

31. For years, Plaintiffs have engaged in nonpartisan voter registration efforts

in order to expand the franchise and promote civic participation generally.  Plaintiffs have

found the voter registration process to be a uniquely effective way to communicate

nonpartisan political messages and encourage fellow citizens to participate in the political

process.

32. While registering voters, Plaintiffs inevitably engage in interactive, one-

on-one conversations with fellow citizens.  They will, for example, (i) generally discuss

the importance of voting and of civic engagement; (ii) inform other citizens about

important issues that will be decided in upcoming elections, such as ballot initiatives and

referenda; and (ii) urge other citizens to associate with Plaintiffs and with one another by

registering to vote and engaging in meaningful collective action to advance shared

political or social objectives.

33.     The collective action that Plaintiffs promote through voter registration and related activities takes a variety of forms, each of which is protected by the First Amendment.  It includes citizens joining together to register to vote and cast ballots for candidates based on those candidates' support for certain issues.  It also includes citizens joining together to register to vote and sign ballot initiative petitions in support of a state constitutional amendment (which only registered voters may do under Florida law), *see* Fla. Admin. Code Ann. R. 1S-2.0091(2)(a), and to then vote for the amendment.  Finally, it includes citizens joining together to register to vote and then contacting elected officials in an effort to convince them to support certain policies.

34.     Each year, in order to advance these First Amendment objectives, Plaintiffs encourage and assist thousands of Florida citizens to register to vote for the first time or update an existing voter registration.  They do so largely through one-on-one interactions with potential voters in diverse communities across the State, both in person and over the Internet.  When Plaintiffs speak with potential voters, these conversations take place at community events, places of worship, workplaces, schools, malls, bus stops, and other places where citizens congregate.  They also occur on citizens' front porches and in their living rooms, when Plaintiffs and others like them organize members, volunteers, and employees to go door-to-door to register voters in residential communities.

35.     Plaintiffs' success in registering new voters depends not only on their ability to persuade others of the importance of registering to vote.  It also depends on their ability to assist others to fill in forms properly, to collect the forms, and to deliver

completed forms to the appropriate State offices; in some cases, Plaintiffs also follow up

to ensure that the State properly adds the new voters to the rolls.  Merely distributing

registration forms is insufficient to ensure the success of a voter registration drive.

Without Plaintiffs' assistance and encouragement, citizens would be far less likely to

complete the forms properly, deliver them to a supervisor of elections, and actually vote.

Community-Based Registration Groups Register Significant Numbers of Florida Voters

36.     Community-based voter registration drives register significant numbers of

citizens to vote in Florida.  According to the U.S. Census Bureau's *Current Population*

*Survey*, as of the November 2010 election, 585,004 Florida citizens, representing 7.3% of

all registered voters, had been registered to vote through such third-party drives in

Florida.  Those numbers are higher for certain communities:  as of 2010 in Florida,

16.2% of African-American registered voters and 15.5% of Hispanic registered voters in

Florida were registered through drives, compared to only 8.6% of non-Hispanic white

registered voters.  U.S. Census Bureau, *Current Population Survey* (2010).

37.     Florida citizens who live in predominantly low-income communities rely

more heavily on Plaintiffs' voter registration activities than do members of more affluent

communities.  In Florida, 13% of registered voters in the November 2010 election with

annual incomes of less than $10,000 registered to vote through third-party drives,

compared to only 6% of those with annual incomes of more than $100,000.  U.S. Census

Bureau, *Current Population Survey* (2010).  Nationwide, 7.7% of those with annual

incomes less than $10,000 registered to vote as of November 2010 through third-party

drives, compared to only 4% of those with annual incomes over $100,000.  *Id.*

38.     This disparity arises, in part, because low-income citizens change addresses more frequently, visit state motor vehicle offices less frequently (where many other Florida citizens register to vote), have lower literacy rates, less Internet access, and are more dependent on public transportation, which makes it more difficult to travel to register at a local supervisor of elections' office.  *See, e.g.*, Andrew M. Fleischmann, *Protecting Poor People's Right to Vote:  Fully Implementing Public Assistance Provisions of the National Voter Registration Act*, NAT'L CIVIC REV., Fall 2004, at 66.

39.     Plaintiffs' efforts to register these and other voters are consistent with the purposes and goals of the NVRA, which was enacted by Congress to "increase the number of eligible citizens who register to vote in elections for Federal office."  42 U.S.C. § 1973gg(b)(1).

40.     Plaintiffs' efforts are also consistent with the Florida Voter Registration Act.  *See* Fla. Stat. § 97.052(1)(b)(2) (requiring Department of State to distribute copies of voter registration applications to "[i]ndividuals or groups conducting voter registration programs"); *id.* § 97.053(1) (requiring certain State offices to accept voter registration applications delivered by "a third party during the hours that office is open or when mailed").

41.     The overall number of registration forms received in Florida has steadily declined since restrictions were placed on community-based registration activities.  From 2000 to 2004, Florida received over 8.6 million voter registration forms.  From 2006 to 2010, after restrictions on community-based registration efforts were implemented, the total number of voter registration forms received dropped to just under 3 million.  *Id.*

42.     Plaintiffs' prior voter registration efforts, along with similar efforts by other individuals and private groups, have resulted in significant numbers of Floridians registering to vote and a strengthening of the State's and the nation's democracy.  But Plaintiffs' and others' ability to continue this success has already been weakened by the existing restrictions placed upon community-based voter registration groups by Florida law, and the declining voter registration rates in Florida are now likely to fall even more precipitously if the Law's new, and much more onerous, restrictions are allowed to stay in place.

### Enactment of the Challenged Law

43.     The Law, 2011 Fla. Laws 40 § 4 (codified at Fla. Stat. § 95.0575), is an amended version of two prior laws—2005 Fla. Laws 277 § 7 and 2007 Fla. Laws 30 § 2—which LWVF and others previously challenged in federal court.  It went into effect on May 19, 2011, when an omnibus bill on voting, H.B. 1355, was signed by Governor Scott.  On that same day, Secretary Browning issued Directive 2011-01, which directed all county supervisors of elections to immediately implement this statute.

44.     The very next day, May 20, 2011, the Florida Division of Election issued an Emergency Rule implementing the provisions of the statute's new registration, reporting, and tracking requirements on a temporary basis, until the State's normal rulemaking process could be completed.  *See* 37 Fla. Admin. Wkly. 1477, 1492–94 (June 3, 2011).  The Emergency Rule also published the official forms that the statute and rules require organizations to submit, including:  Form DS-DE 119 (Registration Form), Form

DS-DE 120 (Registration Agent's Sworn Statement), and Form DS-DE 123 (Accounting of Voter Registration Applications). *Id.*

45.     After the regular rulemaking process, including the notice-and-comment period, was completed, the final Rule (1S-2.042) governing implementation and administration of the Law went into  effect on November 2, 2011, in much the same form as the Emergency Rule.  *See* Fla. Admin Code Ann. R. 1S-2.042.

<u>**Relevant Provisions of the Challenged Law**</u>

46.     The Law adds several severe new burdens to the organized voter registration activities engaged in by Plaintiffs and similar groups, including most notably:

*     The Law requires every "third-party voter registration organization," including Plaintiffs, to register formally with the State *prior to* engaging in any voter registration activities.  It requires each of the organization's "affiliate organization[s]" to file a separate pre-registration form with the State as well.  It also requires all volunteers and employees of these organizations, called "registration agents" in the Law, to publicly register as agents of the organizations that they represent and sign a sworn affidavit that warns of the criminal punishments for "false registration."  Fla. Stat. § 97.0575(1); Fla. Admin. Code Ann. R. 1S-2.042(3)(a), (3)(c).  These pre-registration requirements will make it significantly harder to conduct voter registration, and will severely chill the volunteerism that is essential for Plaintiffs' activities.

*     The Law requires State officials to affix a unique "identification number" to all voter registration applications that they provide to voter registration groups,

Fla. Admin. Code Ann. R. 1S-2.042(3)(b), 4(a), which not only creates a potentially floating liability for applications not kept within the organization's immediate control, but also publicly discloses which organization assisted each voter with registering.

- The Law mandates that each organization has an ongoing duty to update its registration form every time there is any change to its previously submitted information.  Fla. Admin. Code Ann. R. 1S-2.042(3)(e).  If a registered organization adds a new "registration agent," that agent must sign a sworn statement affirming that the agent will obey all state laws regarding voter registration *before* engaging in any voter registration activity.  *Id.* R. 1S-2.042(3)(c).  The organization must then submit each sworn statement, along with the organization's own updated registration form, within 10 days.  *Id.*  Every time a registered organization "terminate[s]" its relationship with any member or volunteer listed as a "registration agent," it must promptly notify the Division of Elections.  *Id.* R. 1S-2.042(6)(b).  These requirements are not only burdensome, they interfere with Plaintiffs' relationships with members and supporters.

- The Law requires each organization to track all voter registration applications that it provides to its "registration agents," and it further requires these groups to submit monthly reports detailing the number of applications provided to and received from its "registration agents," even when the organization neither provides nor receives any applications.  Fla. Stat. § 97.0575(5); Fla. Admin. Code Ann. R. 1S-2.042(5).  This is a significant and

unnecessary burden that will divert scarce organizational resources that would otherwise be spent registering voters, checking applications for accuracy and completeness, and following up with voters.

- The Law requires organizations to turn in each voter registration application, either in person or by mail, "within 48 hours after the applicant completes it," and late delivery can result in up to a $1,000 fine. Fla. Stat. § 97.0575(3)(a). Fines may be assessed even where delay is due to events outside the organizations' control, such as "force majeure or impossibility of performance," or an "unclear" postmark. *Id.* § 97.0575(3)(b); Fla. Admin. Code Ann. R. 1S-2.042(7)(a). The operation of this delivery requirement is both vague and arbitrarily strict, and the potential for large fines against organizations like Plaintiffs would entail devastating financial and reputational damage.

- The Law requires organizations to submit all mandated forms—including pre-registration forms (Form DS-DE 119), sworn statement forms (Form DS-DE 120), and monthly tracking forms (Form DS-DE 123)—electronically, either as PDF attachments to e-mails or via facsimile. Fla. Stat. § 97.0575(1); Fla. Admin. Code Ann. R. 1S-2.042(3)(a), (3)(f). This requirement imposes an unlawful discriminatory burden on those, like Plaintiffs' volunteers and members, who do not have access to such resources.

- The Law grants sweeping and undefined enforcement powers to the Attorney General to institute any "action for relief" for a violation of the Law,

which can include injunction, criminal prosecution, or "any other appropriate order."  *See* Fla. Stat. §§ 97.0575(4), 104.41.

47.     The Law regulates an almost unlimited range of community-based voter registration activity by broadly defining a "third-party voter registration organization," to include "any person, entity, or organization" that is "*soliciting or collecting* voter registration applications."  Fla. Stat. § 97.021(37) (emphasis added).  The applicable regulations further define "[e]ngaging in any voter registration activities" to mean "soliciting for collection or collecting" registration forms.  Fla. Admin. Code Ann. R. 1S-2.042(2)(b).  Through this sweeping ambit, the Law chills Plaintiffs' constitutionally protected registration activities and penalizes and burdens their political speech and association.

48.     The only exceptions to the Law's expansive scope are:  (i) a limited "family members" exception, which excludes the situation where "[a] person . . . seeks only to register to vote or collect voter registration applications from that person's spouse, child, or parent," Fla. Stat. § 97.021(37)(a), and (ii) an exception for State or county employees or agents, including employees of the Division of Elections, "engaged in registering to vote or collecting voter registration applications" as part of their official duties, *id.* § 97.021(37)(b).

49.     The Law's requirements, both individually and in combination, burden Plaintiffs' protected rights of speech and association in violation of the First and Fourteenth Amendments.  The vagueness of its terms and the arbitrary enforcement that those terms permit violate the Due Process Clause of the Fourteenth Amendment and

amplify the Law's chilling impact on First Amendment rights.  The Law also stands as an obstacle to the NVRA's purpose of increasing voter registration and is inconsistent with several of the NVRA's specific mandates.  Additionally, because of its disproportionate impact on minority communities, the Law violates Section 2 of the Voting Rights Act.

50.     Every "third-party voter registration organization" must abide by the Law's mandates detailed below.

<u>Pre-registration, Registration Agent, and Disclosure</u>

51.     *First*, every "third-party voter registration organization" must register with the Division of Elections *before* "engaging in any voter registration activities."  Fla. Stat. § 97.0575(1).

52.     Specifically, to abide by the Law's pre-registration requirements, each "third-party voter registration organization" must submit a pre-registration form, Form DS-DE 119, setting forth:  (a) the name and permanent address of the "third-party voter registration organization"; (b) the names and addresses of each officer of the organization; (c) the name and address of a registered agent in the State; and (d) the names and permanent and temporary addresses of each and every individual, including both paid employees and volunteers, who will conduct voter registration on behalf of or in association with the organization (deemed "registration agents" by the regulations). *Id.*; Fla. Admin. Code Ann. R. 1S-2.042(1)(a).  The form must be submitted electronically.  Fla. Stat. § 97.0575(1); Fla. Admin. Code Ann. R. 1S-2.042(3)(a).

53.     This form, DS-DE-119, must be submitted not only by the third-party organization, but by each of its "affiliate organization[s]" that engages in voter

registration activity.  Fla. Admin. Code Ann. R. 1S-2.042(3)(a).  The Law defines

"affiliate organization" broadly to include "any person . . . associated with the third-party

voter registration organization as a subordinate, subsidiary, member, branch, chapter, as a

central or parent organization, or through direct or indirect ownership or control."  *Id.* R.

1S-2.042(2)(a).

54.     Each "third-party voter registration organization" must also submit a

sworn statement from each "registration agent" in which the individual affirms that he or

she "will obey all state laws and rules regarding the registration of voters."  Fla. Stat.

§ 97.0575(1)(d).  The statement must be made on the State's Form DS-DE 120, which

lists the felony penalties for "false registration," though the specifics of what constitutes

that crime are undefined on the form.  *Id.*; Fla. Admin. Code Ann. R. 1S-2.042(1)(b).

55.     Even after an organization submits its registration form, it is not deemed

properly registered until the Division assigns it "a unique third-party voter registration

organization identification number that begins with '3P.'"  Fla. Admin. Code Ann. R. 1S-

2.042(3)(b).  An organization cannot lawfully engage in voter registration activities

before receiving this identifier.  *Id.*

56.     Under the applicable regulations, each voter registration form provided by

the State to an organization must include that organization's unique identifier.  *Id.* R. 1S-

2.042(4)(a).

57.     After it is registered, an organization has an ongoing duty to update its

registration form whenever there is any change to the previously submitted information.

*Id.* R. 1S-2.042(3)(e), 6(a)–(b).  Updated registration forms must be filed with the

Division of Elections "within 10 days following the change."  *Id.* R. 1S-2.042(3)(e).

58.     If a registered organization adds a new "registration agent," the new agent

must "complete, sign, and date" a Form DS-DE 120, affirming that the agent understands

and will obey all state laws and rules regarding voter registration "before beginning his or

her duties for the organization."  *Id.* R. 1S-2.042(3)(c).  In other words, the new agent

need not wait until the sworn-statement form is actually filed with the Division before

beginning his or her voter registration activities.  *Id.*  Thereafter, however, the

organization must submit that registration agent's sworn statement, along with the

organization's own updated registration form reflecting this change, within 10 days.  *Id.*

59.     If a registered organization "terminate[s]" its relationship with any of its

registration agents, it must file notice of this change by e-mail or facsimile, or on an

updated Form DS-DE-119, within 10 days.  *Id.* R. 1S-2.042(3)(e), (6)(b).  The regulations

do not define when a volunteer's services are "terminated."

60.     Once filed with the Division of Elections, both the registration form (Form

DS-DE 119) and the sworn-statement form (Form DS-DE 120) become public records.

*See id.* R. 1S-2.042(1)(a)-(b).

<u>Tracking and Reporting Requirements</u>

61.     *Second*, the Law also requires "third-party voter registration

organizations" to track every voter registration form "provided to and received from" any

of its registration agents, even if the form is never completed by a registrant, and to report

to the Division of Elections every month, even if the group had no registration activity in that month.  Fla. Stat. § 97.0575(5); Fla. Admin. Code. Ann. R. 1S-2.042(5).

62.     Specifically, under the applicable regulations, "[b]y the 10th day of each month, each organization shall submit to the Division a Form DS-DE 123 to account for the number of state and federal voter registration application forms provided to and received from each of its registration agents for the preceding month."  Fla. Admin. Code. Ann. R. 1S-2.042(5)(a).  The Law does not define the term "provided to," and, in particular, does not specify whether organizations must report each form that is obtained by agents even if the form is not formally "provided" by the registered organization itself.

63.     This tracking and reporting requirement applies even "[i]f the organization had no voter registration activity in the preceding month," in which case the "third-party voter registration organization" must submit a report "reflecting that it did not provide voter registration applications to, or receive any from, its registration agents."  *Id.*

64.     The Form DS-DE 123 adopted by the Division of Elections is excessive, intrusive, and burdensome.  By its terms, each registered organization must inform the Division by the tenth day of every month of:  (a) the number of voter registration forms that were provided to the organization's registration agents in the preceding month; (b) the number of blank voter registration forms that it received from its agents; and (c) the number of non-blank voter registration forms that it received from its agents.  *Id.* R. 1S-2.042(1)(d).  The organization must separately provide this information as to state application forms and federal application forms.  *Id.*  And, if the organization "did not

provide to, or receive from, a registration agent any state or federal voter registration applications during the month," it must note that on the form.  *Id.*

65.     The completed Form DS-DE 123 must also be signed and dated by an authorized person at the organization, and it must contain both the organization's name and its identifier number.  *Id.*  It must be submitted electronically via e-mail or facsimile. *Id.*; *id.* R. 1S-2.042(5)(b).

66.     Finally, when applicable, a "third-party voter registration organization" must file a final, updated Form DS-DE 123 "no later than 10 days after [the] organization terminates its registration as a third-party voter registration organization."  *Id.* R. 1S-2.042(1)(d), (6)(a).

Delivery Procedures and Deadline

67.     *Third*, the Law requires each "third-party voter registration organization" to "deliver[]" to the Division of Elections or to a supervisor of elections every completed voter registration form it collects "within 48 hours after the applicant completes [the form] or the next business day if the appropriate office is closed for that 48-hour period." Fla. Stat. § 97.0575(3)(a).  Delivery "by the organization . . . may be accomplished by in-person delivery or mail."  Fla. Admin. Code Ann. R. 1S-2.042(4)(d).

68.     While the Law does not provide limitations on who is eligible to deliver completed forms on an organization's behalf, a "factsheet" released by the State indicates that individual registration agents must return all completed forms to their "controlling" organization "for delivery to the applicable Supervisor of Elections or Division."  Florida Division of Elections, Factsheet about Third-Party Voter Registration (2011), *available at*

24

http://election.dos.state.fl.us/pdf/TPVRFinalFactSheet.pdf.  The factsheet is unclear as to

who may collect and submit forms on behalf of the controlling organization, but it

indicates that status as a registration agent is, at least by itself, inadequate.  If an agent

fails to return forms to the controlling organization, he or she may seemingly be held

personally liable for any applicable fines.

69.     For purposes of the Law's 48-hour deadline, delivery of a voter

registration form is measured by "the time the application is actually delivered by the

organization by in-person delivery or, if mailed, the date of delivery shall be the date of a

clear postmark, if one is present on the mailing envelope."  Fla. Admin. Code Ann. R.

1S-2.042(7)(a).  With respect to mail delivery, "[i]f a postmark is not present or unclear,

the date of delivery to the Division or a supervisor of elections is the actual date of

receipt."  *Id.*

70.     The regulations also specify that the "third-party voter registration

organization" or one of its agents must "print the date and time that the voter registration

applicant completed the application in a conspicuous space on the bottom portion of the

reverse side of the voter registration application it collects from a voter registration

applicant in a manner that does not obscure any other entry."  *Id.* R. 1S-2.042(4)(b).  The

rules further set forth a precise "numerical format" in which each date and time entry

must be printed on the completed application form.  *Id.*

71.     Failure to comply with the Law's 48-hour delivery deadline renders an

organization strictly liable for fines, which are detailed below (*infra* ¶¶ 77–79).  Fla. Stat.

§ 97.0575(3)(a)–(b).

72.     As an affirmative defense, an organization can assert that it failed to meet the 48-hour deadline due to "force majeure or impossibility of performance."  *Id.* § 97.0575(3)(b).  Upon such a showing, the State "may" waive the fines.  *Id.*

73.     The 48-hour delivery deadline for completed voter registration applications, as well as its attendant administrative burdens, did not exist previously.  It is a new creation of the Law.

<u>Electronic Submissions</u>

74.     *Fourth*, the Law requires organizations to submit all forms mandated by the Law—including pre-registration forms (Form DS-DE-119), sworn statement forms (Form DS-DE-120), and monthly tracking forms (Form DS-DE-123)—electronically, either as PDF attachments to e-mails or via facsimile.  Fla. Stat. § 97.0575(1); Fla. Admin. Code Ann. R. 1S-2.042(3)(a), 3(f).

75.     This electronic submissions requirement is also a new creation of the Law.

<u>Fines and Civil and Criminal Penalties</u>

76.     *Finally*, violations of the Law result in the following penalties:  (i) strict liability for fines if voter registration forms are not delivered within 48 hours; (ii) undefined civil penalties for any violation of the Law; and (iii) a criminal misdemeanor penalty for any violation of the Law for which a penalty is not otherwise provided.  Fla. Stat. §§ 97.0575(3)–(4), 104.41.

<u>*Fines for the Untimely Delivery of Registration Applications*</u>

77.     The Law imposes the following mandatory fines on "third-party voter registration organizations" for completed voter registration forms that are not "promptly" delivered to the Division of Elections or a supervisor of elections:

- $50 fine per form that is turned in more than 48 hours after it is collected;

- $250 fine per form that is turned in more than 48 hours after it is collected, if the delay is willful;

- $100 fine per form that is collected before the "book closing" deadline but not delivered until after the deadline;

- $500 fine per form that is collected before the "book closing" deadline but not delivered until after the deadline, if the delay is willful;

- $500 per form that is collected but never submitted; and

- $1,000 per form that is collected but never submitted, if the delay is willful.

Fla. Stat. § 97.0575(3)(a).

78.     The Law limits the aggregate fine that may be assessed against any single organization, including affiliate organizations, to $1,000 per calendar year.  *Id.*

79.     As discussed below, *infra* ¶¶ 135–40, even with this statutory cap, the imposition of such fines on Plaintiffs and similar grassroots organizations would cause not only potentially crippling financial harm, but also devastating, permanent damage to these organizations' longstanding and hard-earned reputations as trustworthy and law-abiding public-interest entities.

*Undefined Civil Enforcement Powers of the Attorney General*

80.     The Law also grants unconstitutionally vague enforcement powers to the Florida Attorney General to redress violations of the Law that are referred to her by the Secretary of State or to *prevent* any such violation.  Fla. Stat. § 97.0575(4).

81.     The Law sets forth no express limitations as to the Attorney General's enforcement powers or the civil penalties that may be imposed, providing only that "[a]n

action for relief may include a permanent or temporary injunction, a restraining order, *or any other appropriate order*." *Id.* (emphasis added).

*Criminal Penalties*

82.     In addition, Florida law makes any violation of the Florida Election Code, which includes the Law, *see* Fla. Stat. § 97.011, a first-degree misdemeanor unless the Code provides for a different punishment. *Id.* § 104.41. To the extent the Law specifies punishments for violations of some of its provisions, but not all, officials may invoke this catch-all misdemeanor provision in enforcing the Law.

83.     Conviction of such a first-degree misdemeanor can result in a maximum term of imprisonment of one year, *id.* § 775.082(4)(a), in addition to or in place of a fine, *id.* § 775.083(1). The fine cannot exceed $1,000. *Id.* § 775.083(1)(d).

84.     The cumulative impact of these numerous onerous requirements and strict penalties imposed by the Law severely burden—to the point of stopping—core components of Plaintiffs' community-based voter registration activities.

**The Law's Burdensome Impact on Plaintiffs'
First Amendment Rights to Expression and Association**

85.     Florida's challenged voter registration Law and its accompanying regulations significantly impede Plaintiffs' ability to engage in voter registration activities and thus directly hamper Plaintiffs' fundamental speech and associational rights, which are inseparable and intertwined aspects of those activities. The Law's complex rules impose substantial administrative burdens, strict liability, the potential for personal liability, severe penalties, and the risk of heavy reputational harm for failure to perfectly comply with any of its myriad requirements. Moreover, certain portions of the

Law are vague or confusing, creating legal uncertainties for Plaintiffs.  Each individual

new burden created by the Law is unlawful in its own right, and when implemented

cumulatively, they are particularly crippling and create a severe chill on protected First

Amendment activity.  As a result, Plaintiffs LWVF and Rock the Vote have ceased their

community-based voter registration efforts in the State of Florida.  And while Plaintiff FL

PIRG currently intends to engage in voter registration activities during the 2012 election

cycle, it, too, has been severely burdened by the Law and will necessarily spend less

money, time, and resources on voter registration and more on compliance with the

onerous requirements of Florida's new Law.

        86.     Other grassroots organizations that are similarly situated will likewise lack

the resources, expertise, and/or time required to engage in voter registration activities in a

manner that is in compliance with the Law.

        87.     The Law also eliminates the ability of individual Floridians to

spontaneously assist fellow citizens with registering to vote, a civic service that many of

Plaintiffs' individual members and volunteers have routinely performed of their own

accord.

<u>Pre-registration, Registration Agent, and Disclosure</u>

        88.     The pre-registration, registration agent, and disclosure provisions of the

Law dramatically limit and chill Plaintiffs' ability to recruit, associate with, and utilize

members and volunteers.  Each Plaintiff has limited financial resources and only a few

paid staff.  None can engage in large-scale voter registration activity without relying on

extensive membership networks and large numbers of casual volunteers. Moreover, voter registration is a key tool for engaging potential new members and volunteers.

89. For all Plaintiffs, recruiting, educating, and working with members and volunteers on voter registration efforts are essential avenues for expressing and demonstrating their shared views on the importance of civic engagement and democratic participation.

90. Under the Law, for Plaintiffs to continue engaging in this form of expression and association, they must complete and submit an onerous registration form to the State and receive an authorizing identification number before they can assist any Floridian with registering to vote.

91. Through its "registration agent" requirements, the Law mandates a new legal relationship between Plaintiffs and their members and volunteers in order for them to work together on voter registration. Every time an organization adds a new agent—or makes any organizational change that would affect its registration information—the organization must file that agent's sworn statement and an updated registration form for the organization within 10 days. Fla. Admin. Code Ann. R. 1S-2.042(1)(a), (3)(c), (3)(e). The organization must also notify the Division of Elections every time it terminates its relationship with any registration agent. *Id.* R. 1S-2.042(6)(b). All of these submissions must be made electronically, via e-mail or facsimile. *Id.* R. 1S-2.042(3)(a), 3(f), (6)(b).

92. These requirements, individually and collectively, pose a number of problems for Plaintiffs.

93.     *First*, gathering sworn statements from every "registration agent" poses a massive administrative burden for each of the Plaintiffs.

94.     LWVF, for example, has only two paid employees, neither of whom is employed full time.  These employees cannot perform all of their current duties and also ensure that the Division of Elections timely receives sworn statements from the group's hundreds of volunteers throughout the State.

95.     RTV  had only one paid staff member in the State of Florida at any given time during the 2010 election cycle, and it currently has none.  Constantly submitting updated registration forms and sworn statements for its many *ad hoc* volunteers, many of whom are students, would be an overwhelming burden upon RTV's limited staff and unpaid volunteers.

96.     *Second*, none of the Plaintiffs previously formalized their relationships with volunteers—instead, they widely encouraged others to join them in advancing their mission.  Plaintiffs have no structure for tracking all of the volunteers who assist with voter registration, or for determining when any particular volunteer has "terminated" his or her volunteerism.  Requiring them to do so would create confusion, legal uncertainty, and chill volunteers from signing up due to the burdens and hassle associated with doing so.  In addition, this type of formalized relationship runs counter to the ideals of inclusiveness and active citizenry that are central to the Plaintiffs' missions.

97.     For instance, LWVF's volunteer pool is not limited to its dues-paying members or to its supporters; all types of individuals choose to volunteer.  While some volunteers have worked with LWVF for years, others only volunteer a few times, and still

others volunteer just once.  LWVF does not require volunteers to sign contracts, specify the beginning and ending dates of their volunteerism, or provide updates to LWVF about their volunteer status.  Accordingly, LWVF and the local Leagues have no way of knowing when a volunteer "terminates" his or her volunteerism, and when LWVF therefore, under the Law, must notify the Division of Elections or update their registration form, Form DS-DE 119.

98.     Moreover, the notion of forcing volunteers to enter into a formal or contractual relationship is inconsistent with LWVF's mission and longstanding practice—to create an inclusive environment that facilitates *ad hoc* volunteerism on an as-needed basis.  For LWVF, adhering to the Law's requirements would necessitate a cultural change likely to alienate former League volunteers and deter future volunteerism.

99.     Similarly, while RTV provides prior training to all of its staff and lead volunteers, it often recruits additional volunteers for voter registration drives by sending e-mails or text messages to its local member list, which, in Florida, could reach 82,000 individuals.  Accordingly, it is not uncommon for RTV members to show up to volunteer to assist voters to register without scheduling or prior notice.  Occasionally, non-members may also show up to volunteer, particularly if they are friends or family members of a scheduled volunteer.  These *ad hoc* volunteers are likely to join RTV's e-mail list, but may or may not assist with any future voter registration efforts.  There is no way to determine when these volunteers cease being "agents" of RTV, and when RTV must notify the Division or update its registration form.

100.    The registration agent requirement poses a particular problem with regard to RTV's "Democracy Class" program, through which RTV partners with local high school teachers to promote civic education and voter registration.  These local teachers would almost certainly be considered RTV's "registration agents" under the Law, because RTV provides teachers with a civic education toolkit that includes registration forms.  But, if a teacher collected voter registration forms during an RTV Democracy Class and then failed to submit these forms within 48 hours, RTV would be held strictly liable.  RTV cannot assume such expanded liability.

101.    FL PIRG also depends on spontaneous volunteering, and particularly at campus events, it accepts volunteers at any level of commitment.  Requiring each volunteer to first fill out and submit a sworn registration agent form and specify the length of his or her commitment is fundamentally at odds with FL PIRG's inclusive mission.

102.    *Third*, all of the Plaintiffs believe that substantial numbers of their volunteers would be unlikely to sign the sworn statement forms due to the threatening descriptions of felony penalties for false registration.

103.    *Finally*, some of Plaintiffs' volunteers will be uncomfortable having their names and personal information on file as a public record as an "agent" of the organization.

104.    For instance, RTV has been heavily criticized by certain political and news organizations hostile to their activities in past election cycles.  Some volunteers will

be afraid they could be harassed as a result of publicly disclosing their association with RTV.

Tracking and Reporting Requirements

105.    Under the Law, all registered "third-party voter registration organizations" must account for every voter registration form that is "provided to and received from each of its registration agents" by submitting monthly reports via e-mail or facsimile. Fla. Stat. § 97.057(5); Fla. Admin. Code Ann. R. 1S-2.042(5).  These requirements also directly burden Plaintiffs' relationships with their volunteers and members and ability to communicate their message of civic participation through a volunteer network.

106.    *First*, these tracking and reporting requirements pose a serious administrative burden upon Plaintiffs, who have massive volunteer networks but limited administrative staff and access to office equipment.

107.    For instance, LWVF has 29 local Leagues throughout the State, none of which has any paid staff and only one of which has physical office space.  Keeping track of every time one of its countless volunteers requested blank application forms from the State or received completed forms from potential voters is not possible with the League's current staff and organizational structure.  Moreover, LWVF cannot afford for its already overextended two-person staff to spend the time necessary to prepare and submit the requisite monthly reports to the State.

108.    Even if it were possible for LWVF to comply with the tracking and reporting requirements, it would divert limited financial resources and staff time from actual voter registration and other important communications and activities.  Moreover,

34

the magnitude of this monthly task and its recurring nature greatly increase the risk of

inadvertent error, which could result in substantial legal, financial, or reputational harm

to the League.

109.    *Second*, these tracking and reporting requirements are vague, potentially

chilling Plaintiffs from simply providing information to members and volunteers,

separate from any registration collection efforts.

110.    For instance, it is not clear how the tracking requirements apply to

registration forms made available by RTV online.  RTV frequently refers its registration

agents, teachers, and others to the organization's online voter registration system, but it

does not know whether this constitutes forms that are "provided to" its registration

agents.

111.    *Third,* all forms that are pre-marked with a group's "third-party voter

registration organization" identifier expose that group to a greatly expanded threat of

liability for forms that are taken or lost before Plaintiffs can even attempt to collect them.

This includes every single form obtained from Florida election officials, which must be

pre-marked with each group's "3PVRO" identifier.  *See* Fla. Stat. § 97.0575(2); Fla.

Admin Code. R. 1S-2.042(4)(a).  This is a very real threat to Plaintiffs, who conduct

large-scale voter registration drives on college campuses and other busy public places

where a potential registrant might suddenly leave with a pre-marked form.  If that form is

then submitted past the 48-hour deadline, Plaintiffs, it would appear, are held strictly

liable.

112.     For example, despite Plaintiffs' volunteers' best efforts to prevent it,

potential registrants sometimes start to fill out their forms in person but then leave

quickly with blank or partially completed forms.  In this circumstance, it appears that

Plaintiffs may be held strictly liable for any pre-marked forms submitted after the 48-

hour deadline, even though they had no ability to control the forms' submission.

113.     FL PIRG's practice has always been to obtain voter registration forms

from county supervisors' offices at its campus drives, and under the Law these new forms

would have to be stamped with FL PIRG's identifying number.  FL PIRG routinely

interacts with potential registrants who take a blank form or begin completing a form and

then take it with them before completing it.  This is common at campus events, especially

when students are on their way to class.  FL PIRG encourages the broadest possible

dissemination of voter registration forms, and does not ever stop individuals from taking

forms.  This means that under FL PIRG's practices, any completed form pre-marked with

the organization's number and taken from a FL PIRG table during any event could lead

to strict liability fines even if FL PIRG never handled it.

114.     *Finally*, requiring that all completed forms include an organization's

"third-party voter registration organization" identifier will undoubtedly deter some

potential voters from registering with organizations like Plaintiffs.

<u>Delivery Procedures and Deadline</u>

115.     Under the Law, Plaintiffs must submit every completed registration

application to the State within 48 hours of completion.  Fla. Stat. § 97.0575(3)(a).  Failure

36

to do so results in automatic fines and subjects Plaintiffs to the risk of a civil enforcement action. *Id.* § 97.0575(3)–(4).

116.    Moreover, at least one document issued by the State suggests that completed forms must be submitted by the registered entity, rather than by individual registration agents. *See* Florida Division of Elections, Factsheet about Third-Party Voter Registration (2011), *available at*

http://election.dos.state.fl.us/pdf/TPVRFinalFactSheet.pdf.

117.    This tight deadline, combined with strict liability for all late submissions and possible limitations on who can submit completed forms on behalf of an organization, is extremely burdensome for Plaintiffs for a number of reasons.

118.    *First,* if registration agents are indeed barred from submitting completed forms directly, and if completed forms must first be collected by Plaintiffs from their volunteers and then submitted directly by Plaintiffs to the State, this would impose an effectively insurmountable barrier to their registration efforts.  Plaintiffs each conduct registration activities through a wholly decentralized volunteer force.  For instance, LWVF has limited staff and resources and is wholly dependent upon its 29 local Leagues to organize and conduct voter registration throughout the State.  FL PIRG is similar:  It has one office and one staff member and depends upon student volunteers across Florida to spearhead its efforts.  RTV does not even have a physical headquarters in Florida; it operates remotely and relies upon partnerships with students, teachers and other volunteers to effectuate its mission.  With their existing structures, it would not be

possible for Plaintiffs to collect every completed registration form from every one of its agents *and then* submit these forms to the State within 48 hours.

119.    *Second*, even assuming that individual agents would be allowed to submit completed forms on Plaintiffs' behalf, it would still be virtually impossible for Plaintiffs to continue with their traditional model of voter registration under the constraint of a 48-hour deadline.  If they continued to conduct voter registration activity, as they have in the past, Plaintiffs would be at severe risk of financial penalties and reputational damage for noncompliance.

120.    Indeed, LWVF's decentralized volunteers could easily miss deadlines required by the Law through no fault of their own, and without jeopardizing the forms in any way.  For instance, LWVF volunteers in charge of a registration event may work full time and may not have time to take the forms to the LWVF office or to an election supervisor immediately after an event.  Given the tight deadline, every short delay—due to traffic, weather, ill health, an unexpected family emergency, or countless other contingencies—could lead to automatic fines.  Some volunteers may be elderly or lack a car, and need assistance in submitting forms.  According to the public statements of several County Supervisors of Elections, a delay of even a minute could cause them to report an organization's delinquency to the Secretary of State.

121.    In RTV's extensive experience, it usually takes two to five days for RTV to review and submit completed voter registration forms.  For instance, many volunteers are students who do not have cars, and college campuses—where RTV's tabling events are generally held—are typically not close to county offices (and certainly outside of

walking distance).  In such a circumstance, it would be near impossible for lead

volunteers or RTV staff to get completed forms from other volunteers, check them for

accuracy and completeness, and submit them within 48 hours.

122.    FL PIRG strives to turn all completed forms in to elections officials within

two days; however, particularly during peak registration times or multi-day drives, it

cannot routinely turn in all forms within 48 hours of receipt.  Doing so would drain

critical resources from FL PIRG's organizers, as they would have to spend much more

time in transit and attending to administrative responsibilities, rather than registering

others to vote.

123.    *Third*, even attempting to meet the Law's strict deadline would force

Plaintiffs to drastically change longstanding practices and curtail the quality and quantity

of their voter registration efforts.  This will further reduce the effectiveness of Plaintiffs'

efforts to communicate to members, volunteers, and the public their message of civic

engagement and democratic participation.

124.    For instance, under the Law, LWVF could no longer engage in multi-day

registration drives.  These drives have historically been an important part of LWVF's

voter registration program, and thus central to communicating and advancing LWVF's

mission of facilitating widespread civic participation.

125.    The 48-hour deadline, combined with the Law's other burdens and strict

penalties, would also prevent RTV from incorporating voter registration into its

Democracy Class program.  But, without the voter registration component, Democracy

Class would be significantly less effective in communicating and advancing RTV's mission of getting young people involved in the political process.

126.    *Fourth*, the Law's strict deadline severely curtails Plaintiffs' opportunities to review completed forms to ensure their accuracy and completeness, and to follow up with registrants before submitting them if necessary.

127.    For example, to the extent LWVF would be able to comply with the 48-hour requirement, compliance would prevent LWVF from following its standard procedures for ensuring that information is not missing from forms, because League volunteers would be in such a rush to submit the forms within 48 hours.

128.    To comply with the deadline, RTV would likely have to forgo collecting contact information from registrants and engaging in follow-up communication.  This would preclude RTV from following up with registrants if there was any problem with the forms, and make it impossible for RTV to remind registrants to vote or to otherwise communicate with them.

129.    *Fifth*, although the regulations allow forms to be postmarked by the submission deadline rather than submitted in person, "[i]f a postmark is not present or unclear, the date of delivery to the Division or a supervisor of elections is the actual date of receipt."  Fla. Admin. Code Ann. R. 1S-2.042(7)(a).  Thus, every mail-in form forces Plaintiffs and their volunteers to accept the risk of a late submission as a result of an unclear or undated postmark—through no fault of their own.

130.    *Finally*, the Law, as interpreted through its implementing regulations, is confusing and ambiguous, creating uncertainty as to when forms would actually be due in many situations.

131.    Because of the confusing and unclear language and interaction of the Law and implementing regulations, none of the Plaintiffs understands how the timing requirements would operate in practice.

<u>Electronic Submissions</u>

132.    The burdens imposed by the Law are further exacerbated by its requirement that all mandated forms be submitted electronically by e-mail or facsimile. Fla. Stat. § 97.0575(1); Fla. Admin Code. R. 1S-2.042(3)(a), (3)(f), (5)(b), (6)(c).  This requirement places a disparate burden upon Plaintiffs' staff and volunteers who do not have readily available access to a computer, scanner, or fax machine.

133.    For example, for Plaintiff LWVF, only one of the local Leagues has a physical office, meaning that the vast majority of its volunteers must rely on their own office equipment.  Many of LWVF's members and volunteers are retirees who are not comfortable using scanners or computers and who do not have access to business equipment such as fax machines.

134.    Similarly, RTV does not provide state-based staff members with office equipment such as printers, fax machines, or scanners.  Instead, state-based staff purchase such services, as needed, at office supply and service centers.  Electronically submitting all relevant paperwork pertaining to the organization's large number of Florida-based

volunteers and the tens of thousands of voters they registered in the State would be very difficult, costly, and time-consuming for the organization.

<u>Fines and Civil and Criminal Penalties</u>

135.    The fines and penalties imposed by the Law threaten Plaintiffs and their individual volunteers with substantial monetary liability, reputational damage, other unspecified civil penalties, and potential criminal punishment.  These risks have chilled voter registration activities by Plaintiffs and by individual volunteers.

136.    The Law's strict fines are multiplied by each individual voter registration application that is not submitted within the requisite 48-hour period.  Fla. Stat. § 97.0575(3)(a).  While the Law's fines are capped at a total of $1,000 annually, *id.*, for non-profit groups like Plaintiffs this is a substantial amount of money.

137.    Moreover,  to the extent that Plaintiffs' volunteers, many of whom are senior citizens or students on limited budgets, may be deemed separate "third-party voter registration organizations" under the Law and thus separately liable, such an amount could be devastating.  *See League of Women Voters of Fla.* v. *Browning*, 575 F. Supp. 2d 1298, 1316 (S.D. Fla. 2008) (interpreting prior version of law to impose joint and several liability for late submission of forms upon individuals as well as their affiliated organizations).  For example, the Tallahassee League, like all local Leagues, has no staff and is composed entirely of volunteers.  Its annual income is approximately $5,000, derived mostly from member dues.  It uses these funds to pay its membership fees to LWVF and the national League, and with what little is left, to print and mail voter

information brochures that describe local, state, and national issues.  A fine of $1,000 would completely drain that group's resources.

138.    The Law additionally provides that if the Secretary of State reasonably believes that a person has committed a violation of the Law, he may refer the matter to the Attorney General to bring an action for enforcement.  Fla. Stat. § 97.0575(4).  The penalties under this provision are wholly undefined, except that the Law specifies that the Attorney General may seek a permanent or temporary injunction to prevent a future violation, as well as "any other appropriate order."  *Id.*  Defending such an action would certainly involve substantial legal costs and reputational damage to Plaintiffs, in addition to whatever remedies the Attorney General may seek to obtain—all harms that make assisting in voter registration a risky activity in Florida.

139.    For instance, LWVF has an annual budget of roughly $99,000, which it uses in full to pay its operating expenses.  The League would have great difficulty paying for the legal representation necessary to defend itself were the Attorney General to bring an action against it.

140.    Equally problematic is the threat of reputational harm to LWVF.  LWVF has been registering Floridians to vote for over 70 years.  It zealously guards its longstanding and hard-earned public reputation for trustworthiness.  Beyond the potentially devastating financial costs that would be necessitated by a legal defense, the LWVF would endure a considerable loss of public esteem and confidence, crippling the organization's continued effectiveness.  The possibility of such financial and reputational

harm understandably frightens LWVF and discourages it from engaging in voter registration under the Law.

141.    Finally, Plaintiffs also face the potential of criminal misdemeanor liability for any violation of the Law for which the Florida Election Code does not otherwise specify punishment.  Fla. Stat. § 104.41.

## The Law Does Not Serve a Legitimate or Compelling State Interest

142.    The State cannot establish a legitimate, much less compelling, state interest in restricting Plaintiffs' voter registration efforts, and those of similar community-based voter registration groups, in the manner provided in the Law.  There is no indication that Florida's existing law was inadequate in addressing the State's interest in preventing voter registration fraud and ensuring the integrity of the registration process.  Furthermore, even if the State had discovered shortcomings in the existing law, the new Law burdens far more speech and associational activity than is necessary to accomplish any legitimate governmental interest.

143.    The Law is not necessary to address voter registration fraud or misconduct.  Florida law separately imposes criminal penalties on persons who "knowingly destroy, mutilate, or deface a voter registration form or election ballot or obstruct or delay the delivery of a voter registration form or election ballot."  Fla. Stat. § 104.0615(4).  A person who violates this section commits a felony in the third degree, *id.* § 104.0615(5), and may be punished by up to five years' imprisonment, a $5,000 fine, or both, *id.* §§ 775.082(3)(d), 775.083(1)(c).

144.     In addition, before § 97.0575 was modified by H.B. 1355, it already imposed fines of $1,000 for willful refusal to submit a completed voter registration application, $500 for each application collected before but willfully submitted after the book-closing deadline for an election, and $250 for each application willfully submitted more than ten days after it was delivered to a third-party voter registration organization or a person acting on the organization's behalf.  2007 Fla. Laws  30, sec. 2, § 97.0575(3) (amended 2011).  Upon information and belief, the State has had no occasion to impose fines for any of these willful violations under this prior version of the law.

145.     Nor is the Law needed to deter inadvertent mishandling or untimely submission of registration applications.  Prior Florida law already imposed fines of $50 for each application submitted more than ten days after a voter registration organization collected it, $100 for each application submitted after the book-closing deadline for an election, and $500 for each application that a community-based voter registration organization collected but did not submit to the Division of Elections.  *Id.*  Upon information and belief, the State has imposed very few fines for any of these inadvertent violations under the prior version of the Law.

146.     The legislative history of the Law also provides no evidence that Florida had previously experienced problems with community-based voter registration groups failing to submit applications in a timely manner, whether intentionally or accidentally, under the prior law.  When asked the reason for changing the deadline for application submission from ten days to 48 hours, for example, H.B. 1355's sponsor, Representative Dennis K. Baxley, responded that registration forms are "valued document[s] and the

longer you have these documents out floating around, the more likely they are to be

hazarded to mishap or mischief."  2011 Fla. House Deb., Reg. Sess., at 12:32 (April 20,

2011) (statement of Rep. Baxley).  But Representative Geraldine F. Thompson observed

that election supervisors "have not identified a problem with fraud."  2011 Fla. House

Deb., Reg. Sess., at 02:00:18 (May 5, 2011) (statement of Rep. Thompson).  And Senator

Nan H. Rich pointed out that the bill's supporters were unable to "provide any proof that

the integrity of our election process has been compromised."  2011 Fla. Senate Deb.,

Reg. Sess., at 47:49 (May 5, 2011) (statement of Sen. Rich).

147.    Likewise, the legislative record provides no evidence that the Law's strict

pre-registration and monthly reporting requirements further the State's interest in

ensuring the integrity of the registration process.

148.    Indeed, Senator Michael S. Bennett, the President Pro Tempore of the

chamber, acknowledged that the new Law would impose significant burdens on voters,

but argued that these burdens were a valid goal of the legislation:

> Did you ever read the stories about people in Africa?  The people in the
> desert who literally walk 200-300 miles so they could have an opportunity
> to do what we do?  And we want to make it more convenient?  How much
> more convenient do you want to make it?  Do we want to go to their
> house?  Take the polling booth with us?  This is a hard fought privilege.
> This is something people died for.  And you want to make it convenient?
> To the guy who died to give you that right, it was not convenient.  Why
> would we make it any easier?  I want 'em to fight for it.  I want 'em to
> know what it's like.  I want 'em to go down there and have to walk across
> town to go over and vote.  I want 'em to at least know the date they're
> supposed to vote.  I'd like to have them actually know where they're
> supposed to vote.  Is that too much to ask?  I don't think so. . . . This is
> Florida.  *We do make it convenient for people to vote, but I gotta tell ya I
> wouldn't even have any problem making it harder.*  I would want them to
> really want to be informed.  I would want them to really want to vote as
> badly as I want to vote.  *I want the people in the State of Florida to want*

> *to vote as badly as that person in Africa who is willing to walk 200 miles*
> *for that opportunity he's never had before in his life.  This should not be*
> *easy.*  This should be something you feel with a passion.

2011 Fla. Senate Deb., Reg. Sess., at 35:40 (May 5, 2011) (statement of Sen. Bennett)

(emphases added).

149.    Simply put, the tenuous connections between the Law's restrictive

provisions and the State's purported interest in fraud prevention, along with the revealing

statements by supporters during the legislative debate, demonstrate that the State's

offered rationale is a pretextual one—and can provide no justification for the

unconstitutional burdens on speech and association now imposed by the Law.

### **FIRST CAUSE OF ACTION**

**Violation of the First and Fourteenth Amendment**
**(Burden on Core Political Speech and Associational Rights)**

150.    Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 through 149 as if fully set forth herein.

151.    The Law violates Plaintiffs' constitutional rights to speech and

association.  It does so by severely burdening and chilling Plaintiffs' free speech and

association in, but not limited to, the following ways:

(a)    The Law's myriad onerous requirements and severe penalties threaten

Plaintiffs with debilitating financial and reputational harms, and thus deter them

from engaging in First Amendment protected political activity;

(b)    The Law's pre-registration and sworn-statement requirements impose

burdensome prior restraints on Plaintiffs' speech and associational rights;

(c)     By regulating the "soliciting for collection" of voter registration forms, the Law directly penalizes political speech;

(d)     The Law's sworn-statement requirement, and the intimidating form promulgated by the State, frighten Plaintiffs' individual members and volunteers, chilling Plaintiffs' ability to effectively associate with its members, volunteers, and others;

(e)     The Law's disclosure requirements force community-based voter registration groups to reveal their political and organizational associations to the State, chilling those associations;

(f)     Registration under the Law would require that Plaintiffs comply with onerous monthly tracking and reporting requirements and suffer ongoing burdens on their speech and associational rights;

(g)     Any attempt to comply with the Law would necessitate that Plaintiffs divert much-needed resources from protected voter registration activity; and

(h)     Any attempt to comply with the Law would also require that Plaintiffs formalize their associational relationships in a manner that directly conflicts with their longstanding tradition of open and inclusive membership.

152.    By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

### Violation of the First and Fourteenth Amendment
### (Void for Vagueness)

153.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 152 as if fully set forth herein.

154.    The Law is unconstitutionally vague in, but not limited to, the following ways:

(a)      In failing to define the scope of penalties that can be imposed by the Attorney General, the Law provides no notice of the liability Plaintiffs and others risk by engaging in community-based voter registration activities.  The Law grants virtually unlimited discretion to both the Attorney General and the Secretary of State in imposing penalties and fines, and thus risks arbitrary and inconsistent enforcement against disfavored groups;

(b)      The Law's submission deadline and procedures are confusing and ambiguous;

(c)      The Law's requirements for informing the State when a registration agent's relationship with a registered organization has "terminated" are confusing and ambiguous;

(d)      The Law's tracking and reporting requirements are confusing and ambiguous; and

(e)      It is unclear whether registration agents may submit completed voter registration forms to the State, or if registered organizations are the only entities permitted to submit completed forms.

155.    The vagueness of the Law chills Plaintiffs and others in the exercise of their freedom of speech.

156.    By reason of the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected by 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION
### Violation of the National Voter Registration Act of 1993

157.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 156 as if fully set forth herein.

158.    The Law stands as an obstacle to the achievement of Congress's purpose in passing the NVRA to "increase the number of eligible citizens who register to vote in elections" and "enhance[] the participation of eligible citizens as voters," 42 U.S.C. § 1973gg(b), and to protect the active role that community-based voter registration groups play in the registration process.  *See id.* §1973gg-4(b).

159.    The Law also specifically conflicts with and violates the NVRA in at least four respects:

(a)      The Law's burdensome pre-registration, reporting, and tracking requirements contradict the objectives of  the NVRA and conflict with Florida's obligation to make federal and state registration forms available to community-based voter registration groups;

(b)     By requiring community-based voter registration groups to repeatedly make electronic submissions by facsimile or by e-mail, the Law erects a discriminatory barrier against those who do not have access to, or the financial wherewithal to have access to, the necessary equipment or services and the ability to use them;

(c)     The Law's strict 48-hour deadline for delivery of completed registration forms and its provision that "delivery" only occurs on the date of mailing if the mailing envelope is clearly postmarked—otherwise strict liability for untimely submissions will attach.  It effectively eliminates Plaintiffs' NVRA-protected right to deliver completed registration forms by mail; and

(d)     The Law's requirement that detailed information be added to voter registration forms violates the NVRA's limitations on acceptable content that states may require on such forms, and conflicts with Congress's desire to facilitate registration by protecting registrants' privacy.

### FOURTH CAUSE OF ACTION
### Violation of Section 2 of the Voting Rights Act

160.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 159 as if fully set forth herein.

161.    Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, forbids any voting standard, practice, or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

162.     By severely restricting the registration activities of community-based voter groups, the Law substantially reduces registration efforts that target and disproportionately benefit racial minority communities.

163.     The effect of the Law will leave minority citizens with reduced opportunities to become eligible to vote and, ultimately, to cast a vote for the candidate of their choice.  Therefore, the Law will result in the denial or abridgement of the rights of minority Florida citizens to vote on account of race or color, in violation of Section 2 of the Voting Rights Act.

WHEREFORE, Plaintiffs respectfully request this Court to:

(i)     enter judgment declaring and determining that the provisions of Fla. Stat. §§ 97.021(37) and 97.0575 regulating the voter registration activities of "third-party voter registration organizations," Fla. Admin. Code Ann. R. 1S-2.042, and any other rules promulgated by the State of Florida implementing these provisions, violate the United States Constitution, specifically the First and Fourteenth Amendments thereto, both facially and as applied to Plaintiffs;

(ii)     enter judgment declaring and determining that the provisions of Fla. Stat. §§ 97.021(37) and 97.0575 regulating the voter registration activities of "third-party voter registration organizations," Fla. Admin. Code Ann. R. 1S-2.042, and any other rules promulgated by the State of Florida implementing these provisions, violate and/or are preempted by the NVRA, 42 U.S.C. § 1973gg *et seq.*;

(iii)     enter judgment declaring and determining that the provisions of Fla. Stat. §§ 97.021(37) and 97.0575 regulating the voter registration activities of" third-party voter

registration organizations," Fla. Admin. Code Ann. R. 1S-2.042, and any other rules promulgated by the State of Florida implementing these provisions, violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973;

(iv)    grant appropriate preliminary and permanent equitable relief enjoining Defendants from enforcing these provisions of Fla. Stat. §§ 97.021(37) and 97.0575, Fla. Admin. Code Ann. R. 1S-2.042, and any other rules promulgated by the State of Florida implementing these provisions;

(v)    grant Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1973gg-9(c) and 42 U.S.C. § 1988(b); and

(vii)    grant Plaintiffs such other and further relief as may be just and equitable.

Dated: December 15, 2011

COFFEY BURLINGTON

 /s/ Kendall Coffey_____
Kendall Coffey
Florida Bar No. 259861
Abigail Parent
Florida Bar No. 72284
2699 South Bayshore Drive, Penthouse
Miami, Florida 33133-5408
Tel. 305-858-2900
Fax 305-858-5261

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Robert A. Atkins*
William J. Taylor, Jr.*
1285 Avenue of the Americas
New York, New York 10019-6064
Tel. 212-373-3000
Fax 212-757-3990

Alex Young K. Oh*
Zachary A. Dietert*
2001 K Street, NW
Washington, DC 20006-1047
Tel. 202-223-7300
Fax 202-223-7420

**BRENNAN CENTER FOR JUSTICE AT NEW
     YORK UNIVERSITY SCHOOL OF LAW**
Wendy R. Weiser*
Diana Kasdan*
Lee Rowland*
Mimi Murray Digby Marziani*
161 Avenue of the Americas, 12th Floor
New York, New York 10013-1205
Tel. 646-292-8310
Fax 212-463-7308

**AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION OF FLORIDA, INC.**
Randall C. Marshall
Florida Bar No. 181765
Julie Ebenstein
Florida Bar No. 91033
4500 Biscayne Blvd., Suite 340
Miami, Florida 33137-3227
Tel. 786-363-2700
Fax 786-363-1108

*Counsel for Plaintiffs*

\**Pro Hac Vice* application to be filed