**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

LEAGUE OF WOMEN VOTERS
OF FLORIDA et al.,

        Plaintiffs,

v.                            CASE NO.  4:11cv628-RH/WCS

KURT S. BROWNING, etc., et al.,

        Defendants.

_____/


## ORDER GRANTING A PRELIMINARY INJUNCTION


      This case presents a challenge to Florida Statutes § 97.0575, as amended in

2011, and to an implementing rule, Florida Administrative Code Rule 1S-2.042.

The statute and rule regulate organizations that conduct voter-registration drives.

The plaintiffs are organizations that have conducted such drives in the past and

wish to continue to do so.  They have moved for a preliminary injunction barring

enforcement of the statute and rule.

      This order grants the motion in part based on this analysis.  Under the First

and Fourteenth Amendments, an election-code provision of this kind must serve a

legitimate purpose that is sufficient to warrant the burden it imposes on the right to

vote.  And under the National Voting Rights Act, an organization has a federal

right to conduct a voter-registration drive, collect voter-registration applications,

and mail in the applications to a state voter-registration office.  The Eleventh

Circuit so held in *Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d

1349 (11th Cir. 2005).  But § 97.0575 and Rule 1S-2.042 severely restrict an

organization's ability to do this.  The statute and rule impose a harsh and

impractical 48-hour deadline for an organization to deliver applications to a voter-

registration office and effectively prohibit an organization from mailing

applications in.  And the statute and rule impose burdensome record-keeping and

reporting requirements that serve little if any purpose, thus rendering them

unconstitutional even to the extent they do not violate the NVRA.  The statute and

rule include other provisions that are constitutional and do not conflict with the

NVRA; a primary injunction barring enforcement of those provisions is denied.

I

The plaintiffs are the League of Women Voters of Florida, Florida Public

Interest Research Group Education Fund, and Rock the Vote.  All have conducted

and wish to continue to conduct voter-registration drives in Florida.  As a routine

part of this activity, a plaintiff, acting through an employee or volunteer, urges an

individual to register to vote, provides the individual an application, takes back the

completed application, and mails or delivers the application—together with other

applications obtained in the same way—to a proper voter-registration office.  Done

properly, this serves the constitutional right of eligible citizens to register and vote.

The defendants are the Florida Secretary of State, Director of the Division of

Elections, and Attorney General, all in their official capacities.  They are the state

officials responsible for enforcing the challenged provisions.

The two sides have submitted declarations and exhibits and have fully

briefed and orally argued the preliminary-injunction motion.  As both sides agree,

in order to obtain a preliminary injunction, a plaintiff must establish a substantial

likelihood of success on the merits, that it will suffer irreparable injury unless the

injunction issues, that the threatened injury outweighs whatever damage the

proposed injunction may cause a defendant, and that the injunction will not be

adverse to the public interest.  *See*, *e.g.*, *Siegel v. LePore*, 234 F.3d 1163, 1176

(11th Cir. 2000) (en banc); *Wesley*, 408 F.3d at 1354.  This order addresses these

four factors.  The order does not set out final findings of fact or conclusions of law

that will control the ultimate decision on the merits.

## II

The plaintiffs base their claims on both the Constitution and the NVRA.

They assert that the challenged provisions impose burdens on voter-registration

drives that violate the First and Fourteenth Amendments and that some of the

challenged provisions are unconstitutionally vague.  And the plaintiffs assert that

some of the challenged provisions conflict with, and thus are preempted by, the NVRA.

The defendants acknowledge that a provision of state law that conflicts with the NVRA must yield, but the defendants say the challenged provisions do not conflict with the NVRA.  And the defendants say the plaintiffs' activities do not implicate any constitutional rights at all.

The assertion that the challenged provisions implicate no constitutional rights is plainly wrong.  The plaintiffs wish to speak, encouraging others to register to vote, and some of the challenged provisions—for example, the requirement to disclose in advance the identity of an employee or volunteer who will do nothing more than speak—regulate pure speech.  This is core First Amendment activity. Further, the plaintiffs wish to speak and act collectively with others, implicating the First Amendment right of association.  More importantly, the plaintiffs wish to assist others with the process of registering and thus, in due course, voting.  Voting is a right protected by several constitutional provisions; state election codes thus are subject to constitutional scrutiny.  Together speech and voting are constitutional rights of special significance; they are the rights most protective of all others, joined in this respect by the ability to vindicate one's rights in a federal court.

Every court that has addressed a constitutional challenge to provisions regulating voter-registration drives has concluded that the governing standards are those set out in *Anderson v. Celebrezze*, 460 U.S. 780, 788-90 (1983). There the Court struck down Ohio's early-filing deadline for candidates but based its ruling on principles that apply more broadly to state election laws:

> We have recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer*, *supra*, 415 U.S., at 730. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. . . . The results of this evaluation will not be automatic; as we have recognized, there is "no

substitute for the hard judgments that must be made." *Storer v. Brown*, *supra*, 415 U.S., at 730.

*Anderson*, 460 U.S. at 788-90 (footnotes omitted).

This order applies these constitutional standards and the NVRA.

III

Before the 2011 amendments, § 97.0575 required a voter-registration organization to file with the state Division of Elections a form listing the organization's registered agent and the officers—or other individuals—responsible for day-to-day operations. Fla. Stat. § 97.0575(1) (2010). The statute required an organization to file a quarterly report listing the date and location of voter-registration drives. *Id*. Florida law required an organization, upon receipt of a voter-registration application, to "promptly" deliver it to a voter-registration office. *Id*. § 97.0575(3). Failure to promptly deliver applications subjected the organization to fines up to an aggregate of $1,000 in a calendar year. *Id*. The Southern District of Florida upheld these provisions—and recounted the sometimes-checkered history that led to their adoption—in *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298 (S.D. Fla. 2008) ("*LWV II*"). The court had earlier struck down other, more onerous requirements. *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006) ("*LWV I*").

The plaintiffs do not here challenge these provisions as they existed prior to the 2011 amendments. For their part, the defendants have submitted no evidence

that these provisions failed in any respect to protect the state's legitimate interests in regulating the conduct of voter-registration organizations.  But the 2011 amendments to § 97.0575, together with Rule 1S-2.042, impose new requirements. Some are far more onerous than those struck down in *LWV I*. This order addresses the most important challenged provisions.

IV

The 2011 statute requires a voter-registration organization to deliver a voter-registration application to the Division of Elections or the local supervisor of elections "within 48 hours after the applicant completes it or the next business day if the appropriate office is closed for that 48-hour period."  Fla. Stat. § 97.0575(3)(a) (2011).  Failure to do so subjects an organization to fines up to an aggregate of $1,000 in a calendar year.

The statute makes no provision for mailing in an application, but Rule 1S-2.042(7)(a) provides that a mailed application is deemed delivered on the date of a "clear postmark."  For such an application, the rule changes the statutory deadline from 48 hours to two days.

The state has a substantial interest in seeing that voter-registration applications are promptly turned in to an appropriate voter-registration office. Applications that are not promptly turned in may be lost or forgotten or otherwise mishandled.  Just as a prudent law-enforcement officer promptly delivers evidence

to the evidence room, a prudent voter-registration organization promptly delivers voter-registration applications to the voter-registration office.  And applications that are held and delivered to a voter-registration office *en masse*, especially near a voter-registration deadline, impose an unnecessary burden on voter-registration officials.  The state's interests are easily sufficient to uphold a requirement for reasonably prompt delivery of applications.

Even so, the state has little if any legitimate interest in setting the deadline at 48 hours.  The short deadline, coupled with substantial penalties for noncompliance, make voter-registration drives a risky business.  If the goal is to discourage voter-registration drives and thus also to make it harder for new voters to register, the 48-hour deadline may succeed.  But if the goal is to further the state's legitimate interests without unduly burdening the rights of voters and voter-registration organizations, 48 hours is a bad choice.

Still, lines must be drawn somewhere, and choosing the specific time limit, so long as the limit is not unconstitutional, is the job of the Legislature, not the court.  It is not at all clear that a well crafted 48-hour provision could survive constitutional scrutiny, but that issue need not be decided at this time.  This statute and this rule are not well crafted.  To the contrary, they are virtually unintelligible, close to the point, if not past the point, at which a statute—especially one that

regulates First Amendment rights and is accompanied by substantial penalties—becomes void for vagueness.

The statute requires an organization to deliver an application to an appropriate voter-registration office "within 48 hours after the applicant completes it or the next business day if the appropriate office is closed for that 48-hour period."  Fla. Stat. § 97.0575(3)(a) (2011).  Does "closed for that 48-hour period" mean the entire 48-hour period?  Surely not.  So far as this record reflects, all of these offices close every night; there are no 24-hour voter-registration offices.  Does "closed for that 48-hour period" mean closed at the end of the 48-hour period?  Nothing else makes sense, though if this is what the Legislature meant, it would have been easy enough to say it just this way.

If "closed at the end of the 48-hour period" is what the statute means, it still imposes an onerous, perhaps virtually impossible burden, at least in some instances.  If a voter-registration organization collects a voter-registration application at 8:03 a.m. on Saturday and the appropriate voter-registration office is closed for the weekend, reopening at 8:00 a.m. on Monday, must the organization deliver the application to the voter-registration office between 8:00 a.m. and 8:03 a.m. on Monday?  If the goal is to discourage voter-registration drives and thus also to make it harder for new voters to register, this may work.  Otherwise there is little reason for such a requirement.

The state says issues like these will need to be worked out.  But the state has suggested no legitimate interest served by requirements of this kind.  A voter-registration organization would be ill advised to risk significant fines—and the attendant damage to the organization's reputation—that would result from failing to comply with provisions this difficult to parse.  When rights of this magnitude are at stake, it is not too much to ask the state to work out the issues in advance.

Another substantial flaw in the statute and rule—and a clearer violation of controlling law—is their disregard of a voter-registration organization's interest in mailing in completed voter-registration applications rather than hand delivering them.  The statute makes no provision for mailing at all.  If the statute means what it says—that an application must be received in the voter-registration office within 48 hours after the applicant signs it—a prudent voter-registration organization can never mail in an application.  This is so because even if the organization delivers the application to the Postal Service immediately after the applicant signs it—and this in itself would be virtually impossible—the organization cannot be assured that the Postal Service will deliver it within 48 hours.  Could an organization that collects an application at 10:00 a.m. on Saturday mail it in?  Of course not.  Few voter-registration offices, if any, get mail delivery by 10:00 a.m. on Monday.

Perhaps recognizing that the statute is simply unworkable, Rule 1S-2.042(7)(a) charts a different course.  It purports to change the statute in two ways

to accommodate mailing.  First, the rule provides that an application is deemed

delivered to the voter-registration office not when the office receives it but on the

date of a "clear postmark."  Second, for an application with a clear postmark, the

rule changes the statute's requirement for delivery within 48 hours to a

requirement for delivery within two days—the application need only be

postmarked within two days after the voter-registration organization received it.

 If there is no clear postmark, the rule provides that the date of delivery is the

date when the voter-registration office actually receives it.  The rule does not

purport to change the statutory 48-hour requirement to a two-day requirement for

mailed applications with no clear postmark, but the rule's reference to the *date* of

actual receipt, rather than the *time* of actual receipt, introduces at least some

ambiguity on this score.

 Leaving aside the question of whether a rule can rewrite a statute this

extensively, the rule still has the effect, as a practical matter, of preventing a

prudent voter-registration organization from mailing in the voter-registration

applications that it collects.  This is so because a mailer cannot be sure that the

Postal Service will affix a clear postmark, or that a clear postmark once affixed

will remain clear by the time of delivery on the other end.  A prudent organization

would be ill advised to risk significant fines—and the attendant damage to the

organization's reputation—by mailing in an application under this rule.

The state has no legitimate interest, and claims none, in prohibiting a voter-registration organization from using the mails to send in voter-registration applications.  The state's election officials routinely rely on the mails.  Thus, for example, they distribute absentee ballots through the mails, and they allow voters to send them back using the mails.  The burden that this statute and rule impose on a voter-registration organization's use of the mails, coupled with the absence of any legitimate state interest on the other side of the balance, probably renders these provisions unconstitutional.  In arguing the contrary, the state relies heavily on *American Association of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195 (D.N.M. 2008), but the statute at issue there plainly allowed an organization to put an application in the mail within 48 hours after collecting it, without making the right to do so turn on the unknowable circumstance that it would show up at the voter-registration office with a clear postmark.

Even if the limitations on mailing do not render these provisions unconstitutional, they plainly run afoul of the National Voting Rights Act.  The Eleventh Circuit addressed the NVRA in *Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005).  There an organization conducted a voter-registration drive and mailed to the Georgia Secretary of State 64 completed voter-registration forms.  The Secretary of State rejected them, asserting that under state law forms could not be mailed in *en masse*.  The district

court entered a preliminary injunction, and the Eleventh Circuit affirmed.  The

court squarely rejected the contention—the same contention the State of Florida

makes here—that there is no federal right to conduct a voter-registration drive or to

mail in applications collected at such a drive.  The court said:

> The NVRA requires the states to accept voter registration forms in three ways beyond those through which the states voluntarily elect to accept them: registration by mail, registration in person at various official locations (so-called "registration places"), and registration in conjunction with driver licensing. *See* 42 U.S.C. § 1973gg. In the first instance, these methods are not intended to be exclusive; rather, the Act seeks to encourage voter registration by setting a floor on registration acceptance methods. *See id.* at § 1973gg–1(b); gg–2(a). More importantly, the use of a private registration drive is not a mode of registration at all. Rather, it is a method by which private parties may facilitate the use of the mode of registration by mail, for which the Act *does* provide.

> Nowhere does the NVRA prohibit or regulate voter registration drives; rather, it impliedly encourages them. *See id.* at § 1973gg–4(b) (directing the secretaries of state to make the federal forms provided for in the Act available, "with particular emphasis on making them available for organized voter registration programs"). The only provisions regulating mailed forms are unrelated to the legitimacy of voter drives such as the Foundation's; instead, these provisions regulate the *states* by ensuring that voters delivering valid forms in a timely fashion by mail are registered. *Id.* at §§ 1973gg–2(a)(2), gg–6(a)(1)(D). In other words, they regulate the forms' final content and method of delivery, but do not regulate their dissemination or collection. Thus the Act does not prohibit registration drives, but, because it limits the states' ability to reject forms meeting its standards (which privately collected, mailed forms would do), it does protect them. *See* § 1973gg–6(a)(1)(D) (stating that the states "shall . . . ensure" that voters delivering timely, valid forms are registered); § 1973gg–2(a)(2) (states "shall accept" the federal mail-in form). For these reasons, *it is clear that the [voter-registration organization's]*

> *right to conduct voter registration drives is a legally protected interest.*
>
>     . . . .
>
>     *The NVRA protects Plaintiffs' rights to conduct registration drives and submit voter registration forms by mail . . . .*

*Id.* at 1353-54 (last two sets of emphasis added). The court added that by "requiring the states to accept mail-in forms," the NVRA "regulate[s] the method of delivery, and by so doing overrides state law inconsistent with its mandates." *Id.* at 1354.

*Wesley* thus establishes these principles as the law of the circuit: the NVRA encourages voter-registration drives; the NVRA requires a state to accept voter-registration applications collected at such a drive and mailed in to a voter-registration office; the NVRA gives a voter-registration organization like each of the plaintiffs here a "legally protected interest" in seeing that this is done; and when a state adopts measures that have the practical effect of preventing an organization from conducting a drive, collecting applications, and mailing them in, the state violates the NVRA.

The plaintiffs are likely to succeed on the merits of their challenge to the 48-hour provisions.

V

The 2011 statute requires a voter-registration organization to file with the Division of Elections the names of not only its registered agent and any officer who manages its day-to-day operations—as required under the prior statute—but also *every* officer and, more importantly, every employee or volunteer who is a "registration agent."  Fla. Stat. § 97.0575(1) (2011).  Rule 1S-2.042 defines "registration agent" as a person "who solicits for collection or who collects voter registration applications" for the organization.  Fla. Admin. Code r. 1S-2.042(2)(e).  The rule requires any change in any of this information—including, for example, a volunteer's departure—to be reported within 10 days.  *Id.* at r. 1S-2.042(3)(e).

The state has a substantial interest in seeing that those who collect voter-registration applications actually get them to an appropriate voter-registration office.  This interest is sufficient to uphold a requirement to provide the state the identity of those who run a voter-registration organization and the identity of any employee or volunteer who collects voter-registration applications.  The interest is *not* sufficient to justify a requirement to provide the state the identity of a person who only solicits an application but does not collect it.  Soliciting an application is core First Amendment speech.

Nor is the state's interest sufficient to uphold all the rule's other onerous provisions.  Thus, for example, a volunteer may not have a precise departure date; sometimes volunteers come back for more, and sometimes they do not.  The rule

does not indicate how an organization is to know whether a volunteer has departed forever or plans to come back.  Indeed, the volunteer may not even know that.  The state has suggested no legitimate interest in requiring an organization to file within 10 days a notice that a volunteer is no longer a volunteer.

The effect of these provisions can be illustrated with an example.  If a voter-registration organization sets up a table at a mall or farmer's market, giving out and collecting voter-registration applications, and a volunteer hands out flyers encouraging passersby to register to vote but does not collect or otherwise handle the voter-registration applications themselves, the state has little legitimate interest in knowing the identity of the volunteer.  Indeed, the organization itself may not know the volunteer's identity—anyone willing to hand out flyers will do nicely— and may not know whether the volunteer will come back tomorrow or next weekend or next month or never.  But Rule 1S-2.042(2)(e) defines "registration agent" to include an employee or volunteer who collects or even just "solicits for collection" a voter-registration application.  And § 97.0575(1)(c) requires an organization to list any "registration agent" in its filings.  While "solicits for collection" is hardly a precise term, it plainly means something more than just "collects"; otherwise the phrase would be superfluous.  An organization whose volunteer hands out flyers encouraging recipients to go to the organization's table

and submit a voter-registration application would be ill-advised to risk substantial

penalties by failing to list the volunteer on its filings.

More significantly, the statute requires each registration agent to file a *sworn*

statement that the agent "will obey all state laws and rules regarding the

registration of voters." Fla. Stat. § 97.0575(1)(d) (2011). The statement "must be

on a form containing notice of applicable penalties for false registration." *Id*. The

Division of Elections has adopted a form that suggests that a registration agent

commits a felony and could be imprisoned for five years for sending in a voter-

registration application that includes false information, even if the registration

agent does not know or have reason to believe the information is false. *See* Fla.

Admin. Code r.1S-2.042(1)(b) (adopting Form DS-DE 120); Form DS-DE 120,

included in this record at ECF No. 35-8 (stating that "false registration" and

"submission of false voter registration information" are crimes punishable by up to

five years in prison and omitting any reference to the requirement that a violation

be knowing or willful).

This is not the law; the form is just wrong. *See* Fla. Stat. § 104.011 (2011)

(making it a crime to "willfully" submit false voter-registration information or

"willfully" to procure another person to do so—but not to unknowingly submit

false information provided by an applicant). Indeed, Florida law *requires* a voter-

registration organization to send in each application it receives; a penalty attaches

only to *failing* to send in an application, not to sending in an application that turns

out, unbeknownst to the organization, to include false information.

Requiring a volunteer not only to sign such a statement, but to swear to it,

could have no purpose other than to discourage voluntary participation in

legitimate, indeed constitutionally protected, activities.  This is especially true for a

person who merely hands out flyers; why must *that* person be warned of a possible

felony prosecution?  The state has an interest in advising individuals of the

penalties for criminal conduct, but the state has offered no justification for

requiring a *sworn statement* acknowledging the penalties, let alone for requiring a

person to sign, under penalty of perjury, a statement that is false or at least

misleading.

The plaintiffs are likely to prevail on the merits of their challenge to these

provisions.

VI

The 2011 statute requires the Division of Elections to adopt rules requiring a

voter-registration organization to "account for all state and federal registration

forms used by their registered agents."  Fla. Stat. § 97.0575(5) (2011).  Rule 1S-

2.042(5)(a) requires each organization to file by the 10th of each month a report

setting out the number of forms it provided to registration agents, and the number it

received back from registration agents, during the prior month.  An organization

must file a report even if during the prior month it neither gave out nor received back a single form.

The defendants have suggested no legitimate interest served by these requirements.  The requirements do not provide controls that could assist in ensuring that all completed forms are promptly turned in to a voter-registration office.  In that respect voter-registration applications are different from a police officer's citation pad or a sales clerk's numbered receipts; those ensure that every transaction is properly accounted for.  But the Division makes no attempt to do that with voter-registration applications and could not do so without violating the NVRA, under which an unlimited number of federal forms are available to anyone, over the internet and by other means, making it impossible to track every form. Requiring a voter-registration organization to count the applications it gives out and gets back from employees or volunteers and to file monthly reports on this imposes a burden for no legitimate reason.  The plaintiffs are likely to succeed on the merits of their challenge to these provisions.

VII

The requirement to account for forms—to count the number given out and received back—comes with a corollary.  The 2011 statute says the Division of Elections may by rule "require an organization to provide organization and form specific identification information on each form as determined by the department

as needed to assist in the accounting of state and federal registration forms." Fla. Stat. § 97.0575(5). (2011). The quote seems garbled but it is not; this is what the statute says.

Rule 1S-2.042(4)(c) requires each voter-registration organization to put on the back side of each voter-registration application that the organization turns in an identification number assigned to the organization by the Division. This way the Division, and for that matter any member of the public, can determine whether a voter-registration organization collected the application, and if so which organization did it.

Requiring an organization to identify itself on each form it collects, if intended only to assist "in the accounting of state and federal registration forms" as the *statute* provides, would impose a substantial burden for no benefit; as set out in section VI above, counting the number of forms given out and received back serves no legitimate purpose. But Rule 1S-2.042 requires an organization to identify itself on each form for a different—and constitutionally legitimate— purpose. If an application is received late, or is filled out improperly or is otherwise invalid, the Division can determine who caused the problem. This could lead to appropriate enforcement action or at least to educational efforts designed to avoid a recurrence. Whether, as a matter of state law, the statute authorizes the Division to adopt a rule for this purpose may be unclear, but the plaintiffs do not

and cannot properly challenge the rule on this basis in this federal proceeding. *See*, *e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) (holding that the Eleventh Amendment bars a claim for injunctive relief based on state law against a state or against a state officer in the officer's official capacity).

The plaintiffs say, though, that the identification requirement runs afoul of the NVRA. First, the NVRA provides that a federal voter-registration application form

> may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process . . . .

42 U.S.C. § 1973gg-7(b)(1).

Whether this subsection invalidates the requirement for an organization to put its identification number on a federal form turns on whether this is "identifying information" and whether providing it is "necessary" for the state "to administer voter registration." While the issue is not free of doubt, the better view is that the "identifying information" this subsection addresses is the *voter's* identifying information, and that, in any event, identifying the organization that submits an application is sufficiently "necessary" to the sound administration of the voter-registration process to pass muster under this subsection.

The plaintiffs also invoke another NVRA subsection.  It provides that a federal voter-registration application must include

> a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

42 U.S.C. § 1973gg-7(b)(4)(iii).  While the issue is not free of doubt, the better view is that "the office" at which the applicant submits a voter-registration application means the state voter-registration office and does *not* include a voter-registration organization that collects and sends in the application.

The plaintiffs are not likely to prevail on the merits of their challenge to the requirement that they include an identification number on the reverse of each voter-registration application they collect and submit.

## VIII

Other challenged provisions are not unconstitutional and do not violate the NVRA.

The statute requires an organization to provide information to the Division of Elections "in an electronic format."  Fla. Stat. § 97.0575(1) (2011).  There was a time when this would have imposed a substantial burden.  Now the burden is minimal.  Indeed, electronic filing is probably easier for most organizations that filing a hard copy.

The 2011 statute, unlike the prior version, allows the Secretary of State to refer a possible violation "to the Attorney General for enforcement." *Id*. § 97.0575(4).  The Attorney General may file "a civil action for a violation" and may seek an injunction or other appropriate order. *Id*.   This is unobjectionable.

The earlier statute said the Secretary of State "shall" waive a fine for a violation based on force majeure or impossibility of performance.  Fla. Stat. § 97.0575(3) (2010).  The 2011 statute says the Secretary "may" waive a fine in these circumstances.  Rule 1S-2.042(2)(d) defines "impossibility of performance" narrowly to include only a circumstance an organization "could not reasonably have anticipated."  The difficulties posed by the 48-hour provisions, addressed in section IV above, thus apparently do not qualify.  There is no reason to believe a plaintiff will ever be unable to comply with the statute or rule based on force majeure or impossibility of performance.  Nor is there any reason to believe that if a plaintiff ever *is* unable to comply for this reason, the Secretary will refuse to waive a fine.  The plaintiffs are therefore unlikely to prevail on the present facial challenge to the change from "shall" to "may."

IX

In sum, the plaintiffs are likely to prevail on the merits of their challenge to some of the provisions at issue.  The plaintiffs easily meet the other requirements for a preliminary injunction.

The plaintiffs will suffer irreparable harm if an injunction is not issued, first because the denial of a right of this magnitude under circumstances like these almost always inflicts irreparable harm, and second because when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever.  If an injunction does not issue now, there will be no way to remedy the plaintiffs' continuing loss through relief granted later in this litigation.

The threatened injury to the plaintiffs outweighs whatever damage the proposed injunction may cause the defendants, that is, the state.  Indeed, there is no reason to believe the injunction will cause any damage to the state at all.  Before the adoption of the 2011 statute, the state was operating under provisions that, at least insofar as shown by this record, were working well.  There is no reason to believe that returning to that regime will impact the state's legitimate interests in any way.

Finally, a preliminary injunction will not be adverse to the public interest. The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition.  And allowing responsible organizations to conduct voter-registration drives—thus making it easier for citizens to register and vote—promotes democracy.

X

Federal Rule of Civil Procedure 65 allows a court to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This order requires security in the amount of $500. Either side may move to adjust the amount. And the parties may stipulate to an unsecured undertaking in lieu of security—for example, the filing of a statement by each plaintiff that it will pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained, not to exceed a specified sum.

For these reasons,

IT IS ORDERED:

1.       The plaintiffs' motion for a preliminary injunction, ECF No. 8, is GRANTED IN PART.

2.       Until entry of a final judgment or otherwise ordered, the defendants are enjoined from taking any step to demand compliance with or enforce these provisions:

        (a)     Fla. Stat. § 97.0575(1)(c);

        (b)     Fla. Stat. § 97.0575(1)(d);

        (c)     Fla. Stat. § 97.0575(3)(a), to the extent it requires delivery of an application within 48 hours—or any period less than 10 days;

(d)    Rule 1S-2.042(3)(a), to the extent it requires disclosure of an employee or volunteer who does not actually collect or handle voter-registration applications and to the extent it requires disclosure of a volunteer's termination within 10 days after it occurs;

(e)    Rule 1S-2.042(3)(c);

(f)    Rule 1S-2.042(3)(d);

(g)    Rule 1S-2.042(3)(e), to the extent it requires disclosure of a volunteer's termination within 10 days after it occurs;

(h)    Rule 1S-2.042(5);

(i)    Rule 1S-2.042(6)(b);

(j)    Rule 1S-2.042(6)(c), to the extent it addresses form DS-DE 123;

(k)    Rule 1S-2.042(7)(a)

3.    This preliminary injunction binds each defendant and the defendant's officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this preliminary injunction by personal service or otherwise.

4.    This preliminary injunction will take effect upon the posting of security in the amount of $500 or, if the parties so stipulate, on the filing of an undertaking by each plaintiff in lieu of security.  The clerk must accept a cash bond or other security in this amount.  The parties must confer in good faith on

substituting an undertaking in lieu of security.  And any party may move to adjust the amount of security.

SO ORDERED on May 31, 2012.

s/Robert L. Hinkle
United States District Judge